IN THE MATTER OF THE APPLICATION OF CHARLES L. KELLAR FOR ADMISSION TO THE BAR OF THE STATE OF NEVADA.

No. 4577

May 5, 1965

401 P.2d 616

See also 79 Nev. 28, 377 P.2d 927.

*Bert Goldwater*, of Reno, and *Howard W. Babcock*, of Las Vegas, for Petitioner.

*Howard L. Cunningham*, Chairman, Board of Bar Examiners, and *Robert R. Herz*, Secretary of State Bar of Nevada and of the Board of Bar Examiners, both of Reno, for Respondent.

## O P I N I O N

By the Court, WINES, D. J.:

Charles L. Kellar has shown the court 39 years of irreproachable conduct while living in Brooklyn, New York. For some 20 of these years he was engaged in the practice of the law and had an established practice when

he left New York to make his home in Las Vegas, Nevada, in the spring of 1960. Lawyers and judges with whom he dealt in his practice, have written letters commending his professional competence, sense of ethics and civility. His affiliations portray him as a communicant who attends his church regularly, a party man active in the affairs of his political party, a Negro man sensitive to the problems of his people and persistent in his efforts to solve these problems. His many civic activities while living in New York mark him as a responsible member of his community. He has always been a shrewd and successful investor. He has raised a family of two boys, though the mother of those children and he are now divorced and he has remarried and has two children by his present wife. That he is a scholar of the law is attested to by his having taken and passed the Nevada Bar examination.

The Board of Bar Examiners recommended that he be not admitted on the ground that he had failed to meet character standards. After reviewing the record supplied us we would not have so recommended. We acknowledge that we have the benefit of hindsight and a record supplemented since the time of the board's recommendation, and the supplementary information favors the petitioner. We apprehend too that the members of the board and of the Local Administrative Committee for District 1 in their investigation of his character were handicapped in their performance and in their duty to this court by a lack of power of subpoena and by a nice observation of our Rule 57. This rule was drafted on the premise that admission to practice in this state is a matter of grace and favor, a notion we are now obliged to discard. Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. Our rule has a function. Confidential reports may properly be used to apprise of but should not be used in the trial of issues as to character.

Here we perceive the mischief of the rule and admit it invites error. When the petitioner could not find his name among the successful applicants of the bar he

made inquiry. He was informed that the board had sought and obtained leave to file a supplemental report and a recommendation. Further inquiry elicited from the Secretary of the State Bar that it was the policy of the board to obtain a report on the activities of the applicant if he had practiced in another jurisdiction.

When, several months later, the Local Administrative Committee took up the matter the committee had information that the petitioner had associated with subversive organizations and persons in New York, in several instances practiced law in this state, was guilty of impropriety in a real estate transaction, had attempted submission of spurious items to an adjuster of an insurance claim, and had drafted a letter for another person's signature addressed to Robert Kennedy, Attorney General, charging discrimination in the matter of his application.

At this point we believe the petitioner should have been seasonably and fully advised of these charges, of the intent of the committee to hold a hearing and to take testimony from witnesses and the names of the witnesses should have been endorsed on the notice. Also, at this juncture, counsel should have been appointed to investigate, evaluate, and present the evidence against the petitioner. Having thus removed themselves from the contest the members, not personally involved, could have judiciously ruled upon the issues. At the hearing it is implicit that the petitioner would have been confronted by the witnesses against him, given opportunity to cross-examine, and should have been permitted to call witnesses on his behalf. This is what we read in the text on due process.

Instead, the petitioner was not so noticed nor advised. He was not permitted to confront and cross-examine witnesses against him and did not present any witnesses on his behalf. The committee members interrogated the witnesses and the petitioner and two members were sworn and gave testimony. In this exchange tempers soured and petitioner and the members were soon trading criticisms.

The board and the committees while hearing such issues should adjudicate and not advocate. Advocacy predicates assuming and attempting to sustain a point of view and cannot be reconciled with adjudication.

Confidential reports and the testimony of witnesses taken without confrontation and cross-examination and without notice to the applicant as to the issues cannot prevail against an established good character and the testimony of the petitioner.

Proceedings before the Board of Bar Examiners were conducted in the same manner except that the board heard a number of witnesses who appeared voluntarily to testify on the petitioner's behalf and were cross-examined by the board. The board did not take any evidence against petitioner and apparently relied on that taken by the Administrative Committee.

We do not intend reading the members of the Administrative Committee and the Board of Bar Examiners a lesson on due process. The record reflects their concern with this aspect of the hearings. Nor do we ignore these facts. At the time of the hearing the board did not have power to subpoena and no funds for retention of counsel. We have, in effect, written a new rule and redefined an old rule so as to comply with the ruling in the Willner case.

Before the opinion in the Willner case was handed down, we had denied a preliminary motion by the petitioner Kellar in the instant matter, to disclose the confidential written reports submitted by the National Conference of Bar Examiners and by other persons. Ex parte Kellar, 79 Nev. 28, 377 P.2d 927. At that time the disclosure would have served no purpose. As a practical matter, the hearings before the committee and the board had served to give the petitioner notice of the issues on the subject of his fitness and character.

He was given an opportunity to deny, to explain, and to discuss the charges reflecting on his character and fitness and he did in the course of the hearings. By this

court he was granted leave to supplement the record and submit his affidavits and those of other persons having a firsthand knowledge of the facts. This procedure did not afford the petitioner nor the members of the committee and the board opportunity to confront and cross-examine the witnesses. This approach is not tolerable any longer. But we persist in our previous conclusion that we are not required to disclose confidential written reports by the Willner case. That case would require us and other persons acting as arms of the court, if issues result from a study of the confidential reports, to state the charges against the applicant, and if challenged to produce for confrontation and cross-examination, all witnesses on the issues. When the charge is not denied, or when the evidence in support of the charge is of an undisputed documentary character, procedural due process would be complied with if the applicant is given opportunity to reply or explain.

We turn now to two critical events. The information regarding these events came after the report and recommendation of the Board of Bar Examiners. One we learned of by disclosure from the petitioner and the other was a news event and his part in it is admitted by the petitioner. The evidence therefore comes within the exception noted in the Willner case as the facts are known by us from the statements made by the petitioner.

On November 16, 1962, the petitioner filed in this court his petition in which he alleged that he was in all respects qualified for admission to the Nevada State Bar and that he had been denied that privilege because of racial prejudice. On that same day the petitioner appeared at a television broadcasting station in Reno, Nevada, and was interviewed regarding this issue.

He was asked what legal action he had taken. He stated that he had filed his petition and then added in answer to that question that he believed he had been discriminated against as a Negro and not because of his law attainments or his character. The single evidential fact reported by him in support of that charge was that in 98 years of this state's existence not a single Negro applicant had been admitted to the bar and he said

he thought this was not an accident but "contrived" and to be "eradicated" by efforts on the part of those denied "their just constitutional rights." In answer to another question he enumerated those courts and agencies he was entitled to practice before, adding that none of these privileges had been withdrawn. The interview closed with this question—if he thought it was "strictly racial prejudice." He answered in the affirmative adding that the bar had set out to obtain "secret affidavits to present their things to the members of the Bar." All of these complaints had been alleged in his petition which was a public document, except that the Nevada State Bar had not been accused but the Board of Bar Examiners.

We think it apposite to point out that since this interview two Negroes have been admitted to the bar; that prior to Mr. Kellar's application there had been but a single Negro applicant and he had failed in the bar examination. Also that approximately a month later when a reporter for a Las Vegas newspaper sought an interview from Mr. Kellar he was refused on the ground that the matter was pending in this court.

On or about December 29, 1961, the grand jury of Kings County recommended and the district attorney of that county filed informations against Charles L. Kellar, Cornelia Street, Kellars Industrial Limited, Inc., and Adventure Development Corporation charging those defendants with violations of the New York Rent Control Law during the years 1959 and 1960. The two corporations were family corporations and Charles L. Kellar was the major stockholder. Their corporate purpose was to engage in domestic and foreign real property investments. Cornelia Street, in 1959 and 1960, was the petitioner's secretary. Specifically Charles L. Kellar was charged with perjury in the second degree, a misdemeanor, and with having charged excessive rents, also a misdemeanor. Cornelia Street was similarly charged. There were additional charges made against the corporations.

We are concerned about these actions since it was not until May 13, 1963 that the petitioner disclosed the existence and nature of the actions to this court. It has

been argued that the withholding of this information over that period shows a lack of candor.

These things should be said for the petitioner. The petitioner, who was then residing in Nevada, voluntarily appeared in the actions within weeks of the filing. On application of the People the disposition of the actions was continued from time to time until July 11, 1963, when upon the insistence of the defendants in the cases they were marked ready and set for July 12, 1963. All of the defendants pleaded not guilty. The defendants were prepared to take issue with the People's evidence against them. Finally on July 12, they agreed to this disposition of the actions upon the suggestion of the district attorney. The actions would be dismissed as to all defendants except as to Adventure Development Corporation. That corporation would enter a plea of guilty to the charge of demanding and obtaining excessive rents and that defendant Kellar agreed to pay to the tenants any sums found to be owing by either of the corporations. The district attorney stated in open court that the statute of limitations barred civil remedies and he was concerned with getting relief for the aggrieved tenants. On July 23, 1963 this compromise was executed; Adventure Development Corporation pleaded guilty and paid a civil penalty of a $1,000 fine; the district attorney and Mr. Kellar had agreed on the names of those tenants entitled to recover and a sum sufficient to pay them was handed to the district attorney on that day. The actions against Charles L. Kellar, Cornelia Street, and Kellars Industrial Limited Inc., were dismissed.

The petitioner has offended against the ethic of our Canon and is by that Canon censured. See Canon 20, Canon of Ethics of the American Bar Association. Issues of this kind are not to be tried to the people by means of the news media. The filing fee is the newsworthiness of the litigant's cause, there is not a sifting of the evidence presented and often, as in this instance, the other party is not heard at all. The esteem of some 30 years of seemly endeavor and achievement is now in jeopardy

because of this rash appeal. We could readily understand and forgive his impatience with our admission procedures but we have no patience with his percept of the sinister in the conduct and conclusions of the board and of the committee. Our concern here is with the impress the discipline of our profession has made upon him. Years of industry, achievement, good citizenship and honorable conduct are not compurgators; these years testify to his regard for the profession and his obligations as a professional person. We think it harsh then to deny the petitioner admission because of a single offense of this nature, here disciplined according to the Canon.

We are less troubled about his candidness in reporting the charge against him in New York. He did not shirk his responsibility to the people of the State of New York. If he did this in concern with his application in this state he did not as an opportunist, forthwith report to this court. We, in decent respect to a man who meets his private obligations, write this down as a shrewd and in no manner dishonest appraisal of the complainant's demand. His policy in this action was not discreditable and he has not been disciplined by the bar of New York.

The recommendation of the Board of Bar Examiners that Charles L. Kellar be denied admission is rejected, and we conclude that petitioner is entitled to practice law in the State of Nevada. It is so ordered.

THOMPSON, J., concurs.

BADT, J., dissenting:

I dissent.

Although I concur in many of the things said in the majority opinion,[1] I cannot reconcile myself to restricting this court's reaction to a mere reprimand for his broadcast on television and for his failure to disclose the criminal charges that were pending against him in New

---

[1] Much space is devoted to a criticism of the practice of relying upon statements of witnesses whom the applicant has had no opportunity of confronting and cross-examining. I have no quarrel with the majority on this point. In default of actual presentation of these witnesses for cross-examination by the applicant we must continue to presume that despite the clouds of smoke, there is no fire.

York. It is true that both of these incidents occurred after the recommendations of the Board of Bar Examiners that admission to practice in Nevada be denied. However, we had given the board permission to file a further supplemental report. These matters then developed.

In his television broadcast he said: "I believe that I have been discriminated against, and that I am not being admitted to the bar here purely because of my race. It is not because of my qualifications or my inability or my character, as they say, but rather because they do not want a Negro to practice law in this state. In the 98 years that the State of Nevada has been in existence and so far as I have been able to gather, no Negro has ever been admitted to practice law in its courts. This is not just an accident. This is a contrived and a situation which, of course, can be eradicated and changed only by effort on the part of those who are being denied the opportunity to get their just constitutional rights." Similar statements were made to the Board of Bar Examiners.

First, the statement is misleading with reference to the facts. Only one other Negro had sought admission in Nevada and he failed to pass the bar examination. Since the Kellar application, two Negroes have been admitted in Nevada after passing the 1964 bar examination. No other Negroes, except in the cases mentioned, have ever applied for permission to practice in this state. The same applies to applicants of any other race than Caucasians.

At the time Mr. Kellar broadcast his remarks on television a highly emotional situation existed throughout the United States in general and in Nevada in particular. Civil rights legislation or contemplated legislation was pending in the Congress and also in the state legislature. At the time the remarks were made there was pending in this court the applicant's petition for a review of the recommendations of the Board of Bar Examiners. There can be but little doubt that the telecast had as its purpose the raising of social pressure on this court to reverse the action of the board. In oral argument we asked petitioner's counsel if he thought

that the telecast was a lawyer-like thing to do. The most counsel would admit was that "it was in poor taste." In my opinion it was far worse than simply "in poor taste." His statement, "I am not being admitted to the bar here purely because of my race * * * because *they* do not want a Negro to practice law in this state * * * no Negro *has ever been admitted* to practice in its courts * * *. This is not just an accident. This is a *contrived* * * * situation * * *" was not in effect directed simply to the Board of Bar Examiners. It was a broad wave of his arm which took in the Board of Bar Examiners, the state bar, and this court. (Emphasis supplied.)

The Board of Bar Examiners has often been referred to as an arm of the court. It comprises seven lawyers of high standing in this state. Their task in preparing the bar examinations and, in the case of application for admission by attorneys from foreign jurisdictions, carrying on extensive correspondence with the investigative arm of the National Conference of Bar Examiners, grading the examinations, conducting hearings, is an arduous and difficult one. It is undertaken without compensation. It is a tremendous drain upon the time of the members of the board. It sometimes results, as in the present case, in charges such as those made by Mr. Kellar. As the decision of the board in this case was unanimous, the charge is directed against every member of that board. As to the nature and extent of the character investigation, reference is made to an article by James B. Tippin, Jr., Executive Director, Florida Board of Bar Examiners, entitled "Technique of Character Investigation—Vigilance with Due Process," published in 1963, Volume 32, Nos. 3–4, of "The Bar Examiner," published by the National Conference of Bar Examiners, which is composed of members of law-examining boards and character committees. The article is too long to quote at length, but I may refer to the following part of the author's address to the National Conference of Bar Examiners:

"Those of you who are in the unfortunate position of constantly being designated as respondents in the petitions filed by the disgruntled applicants are not unfamiliar, I am sure, with the applicants' glossary which

invariably includes such terms as 'Kangaroo Court,' 'star chamber,' 'inquisition,' 'persecution,' 'oppression,' 'rumor,' and 'innuendo.' "

Nor can I overlook Mr. Kellar's lack of candor in failing to report the criminal charges against him in New York. The majority opinion makes light of the criminal proceedings pending against Mr. Kellar apparently because the charge of "perjury in the second degree" and the charge of having "charged excessive rents" were both merely misdemeanors. I cannot treat them lightly. They both involve moral turpitude—the making of false affidavits of installation of improvements in the rented premises that would justify increased rentals. These amounted to $3,500 which he in behalf of his corporation (which had pleaded guilty) refunded to the tenants, whereupon the district attorney dismissed the charges. His corporation also paid a $1,000 fine. He reported these proceedings to the board when he must have known that the board had, or was about to receive, knowledge thereof. They were established by introduction of exemplified copies of the court records.

In Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224, cited by the majority opinion, reference is made to the concurring opinion by Justice Goldberg, in which Justices Brennan and Stewart joined. It was said: "* * * [W]hen the derogatory matter appears from information supplied or confirmed by the applicant himself, or is of an undisputed documentary character disclosed to the applicant, and it is plain and uncontradicted that the committee's recommendation against admission is predicated thereon and reasonably supported thereby, then neither the committee's informal procedures, its ultimate recommendations, nor a court ruling sustaining the committee's conclusion may be properly challenged on due process grounds, provided the applicant has been informed of the factual basis of the conclusion and has been afforded an adequate opportunity to reply or explain. Of course, if the denial depends upon information supplied by a particular person whose reliability or veracity is brought into question by the applicant, confrontation and the right of cross-examination should be afforded."

This dissent has nothing to do with due process.

I am in entire disagreement with that part of the majority opinion in which it is stated that the majority is not troubled about his [lack of] candidness in reporting the New York charges against him. I do not agree that "He did not shirk his responsibility to the people of the State of New York." I do not agree with the majority's statement as follows: "If he did this in concern with his application in this state he did not as an opportunist, forthwith report to this court." This appears to me to be admission of his opportunism, which Webster defines as follows: "Art, policy, or practice of taking advantage, as in politics, of opportunities or circumstances, or, often of seeking immediate advantage with little regard for principles or ultimate consequences." I thoroughly disagree with the majority's following conclusion: "We, in decent respect to a man who meets his private obligations, write this down as a shrewd and in no manner dishonest appraisal of the complainant's demand." The majority also deems it important that he has not been disciplined by the bar of New York. He may yet be, if he returns to New York to practice.

I should add that there are places in the record of the hearing before the Board of Bar Examiners which sustain the contention that he was at times evasive and that his testimony is in some instances incredible.

Faced with the situation above outlined it is my conclusion, with due respect to the majority opinion, that the unfavorable recommendation of the Board of Bar Examiners should be followed and the applicant denied admission to the bar of this state.